# EXHIBIT 1

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/13/2025 3:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

JONATHAN J. DELSHAD, Bar No. 246176
LAW OFFICES OF JONATHAN J. DELSHAD, PC.
1663 Sawtelle Blvd., Suite 220
Los Angeles, CA 90025
Telephone:    424.255.8376
Fax:          424.256.7899
E-mail: jdelshad@delshadlegal.com

Attorney for Plaintiff
DEREK DIXON

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES, UNLIMITED JURISDICTION

DEREK DIXON, an individual

    Plaintiff,

  vs.

TYLER PERRY, an individual; TPS
PRODUCTION SERVICES, LLC, a Limited
Liability Company; AND ACTION LLC, a
Limited Liability Company and DOES 1-50,
Inclusive,

    Defendants.

Case No. 25STCV17235

### COMPLAINT:

1.    Quid Pro Quo Sexual Harassment
(Gov. Code 12940(j)).
2.    Work Environment Harassment
(Gov. Code 12940(j))
3.    Sexual Harassment (Ralph Act
§51.9)
4.    Workplace Gender Violence (CC
§52.4)
5.    Violation of Bane Act (CC §52.1)
6.    Sexual Battery (CC 1708.5)
7.    Sexual Assault (CC 340.16)
8.    Negligent Retention
9.    Intentional Infliction of Emotional
Distress
10.   Retaliation - FEHA

### DEMAND FOR JURY TRIAL

LAW OFFICES OF JONATHAN J. DELSHAD, PC

LAW OFFICES OF JONATHAN J. DELSHAD, PC

## SUMMARY OF ACTION

1.      Plaintiff, Derek Dixon, ("Plaintiff") files his Complaint against Defendant Tyler Perry aka Emmitt Perry Jr.("Perry"); TPS Production Services, LLC ("TPS") and And Action, LLC ("AA"), (together, "Defendants"), alleging as follows:

2.      The following complaint is pled on information and belief:

3.      This case arises from a sustained pattern of workplace sexual harassment, assault, and retaliation perpetrated by Tyler Perry, a powerful media mogul, against Plaintiff Derek Dixon, a professional actor and screenwriter. Mr. Perry is an American actor, filmmaker, and playwright who has built one of the most successful careers in the film and television industry. Mr. Perry took his success and power and used his considerable influence in the entertainment industry to create a coercive, sexually exploitative dynamic with Mr. Dixon—initially promising him career advancement and creative opportunities, such as producing his pilot and casting him in his show, only to subject him to escalating sexual harassment, assault and battery, and professional retaliation when Mr. Dixon did not reciprocate Mr. Perry's unwanted advances. These events occurred while Mr. Dixon was employed as a series regular on the Tyler Perry show "The Oval," and while Mr. Perry held direct control over his employment, compensation, and creative opportunities.

4.      Tyler Perry rose, against all odds, to become one of the powerful figures in the entertainment industry. His success story—once a symbol of perseverance and self-made achievement—has now become a cautionary tale of how unchecked power, wealth, and influence can corrupt those who attain it. Among other contracts, Perry received a lucrative multi-year partnership with the Oprah Winfrey Network and his net worth tops $1.36 Billion.

5.      Tyler Perry's rise to fame and fortune elevated him from a powerless victim to a figure of tremendous wealth, influence, and power, culminating in the ownership of his own film studio.

6.      Rather than using his influence responsibly, Tyler Perry has engaged in a pattern of misconduct where he exploited his position of power.

7.      Tyler Perry has been using his power and influence to molest, abuse, and sexually assault impressionable and vulnerable employees and actors who look to him for guidance and mentorship

COMPLAINT

while pursuing their dreams.

8.      Just like Harvey Weinstein, Bill Cosby, R. Kelly, Sean "P-Diddy" Combs, Kevin Spacey, Roger Ailes, and many others in the industry, Mr. Perry's success has led him to believe that money and influence can get him whatever he wants. That belief slowly transformed into the false idea that Mr. Perry can get whomever he wants. There are things in life that money cannot buy.

9.      Mr. Perry sought the one thing his wealth and influence could not purchase—a sexual relationship with a man who would remain silent. Perry told Mr. Dixon that his ideal relationship would involve a male sexual partner who he could provide for, and who would be loyal but emotionally detached. Perry told Dixon, "Whoever ends up with me is gonna be a happy motherfucker." In essence, Mr. Perry desired a one-sided, coercive dynamic with a subordinate— an arrangement devoid of mutual consent or emotional reciprocity. Thus began Perry's calculated pursuit of Mr. Dixon.

10.     This was not Mr. Perry's first instance of sexual exploitation. He has demonstrated a troubling pattern of exploiting vulnerable male actors and employees, leveraging his industry power to create a cycle of hope and dependency. First, he offers aspiring actors the prospect of career-defining opportunities—roles that promise visibility and advancement. Then, once they are in his professional orbit, he uses the weight of his influence to ensnare them, positioning their success as contingent on meeting his demands, in a quid pro quo sexual compromise. This pattern of behavior reveals a calculated use of professional power for sexual leverage.

11.     Using his influence, Mr. Perry provided vulnerable men with acting positions, roles, show contracts, cars, and money. Once the object of his desire was hooked, Tyler Perry would then put them in fear of losing it all unless they engaged in Mr. Perry's perverted desire for sexual gratification. Mr. Perry would easily "kill off" a character in a show of an actor who failed to indulge Perry's sexual fantasies.

//

//

//

//

LAW OFFICES OF JONATHAN J. DELSHAD, PC

- 3 -
COMPLAINT

12. In one such exchange, Perry stated that he could "fix" things because the actors of a show he was filming should all be scared because they were all shot at and "we don't know who lives." Meaning that Tyler Perry was going to use this as a tool to gain compliance with his desires.



13. Derek Dixon was Mr. Perry's sexual desire ever since they became acquainted. Dixon was working as part of the event staff for a party hosted by Mr. Perry, when Perry noticed him. Perry immediately offered Dixon the chance to audition for a part in one of his TV productions.

14. Dixon agreed and was on set with Perry behind the camera for weeks in close quarters. During the time they were filming, Perry would send flirtatious text messages to Dixon. For example, in one message, Perry stated that he was jealous when he saw Dixon going on walk with another man named Brad.



//
//
//
//
//
//
//
//

COMPLAINT

15. In another text message, Perry stated to Dixon "What's it going to take for you to have guiltless sex? Have y'all found that yet in therapy?" … "You can [] have freedom from religious guilt and still believe in Christ."



16. Plaintiff carefully navigated a friendly demeanor to prevent the loss of income and opportunity on the one hand, and on the other a firm boundary against Perry's advances. Often, when Mr. Perry started drinking, he would demand more attention from Plaintiff and get more aggressive with his flirting.

17. On one occasion when Mr. Perry was drinking, he started to become extremely annoyed when Mr. Dixon avoided him. Mr. Perry stated that of the 600 people in his phonebook, he only wanted to talk to Mr. Dixon:



COMPLAINT

LAW OFFICES OF JONATHAN J. DELSHAD, PC

LAW OFFICES OF JONATHAN J. DELSHAD, PC

18.     Dixon did his best to tiptoe around Mr. Perry's sexual aggression while keeping on Mr. Perry's good side. Mr. Perry made it clear to Dixon that if Dixon ignored Perry or failed to engage with the sexual innuendos, Dixon's character would "die" in the next season. Indeed, Dixon's character "Dale" was shot four times in the chest at the end of his first season on "The Oval," and Perry always held this over Mr. Dixon's head, implying that "Dale" would survive if Dixon kept Perry "happy."

19.     Once Perry recognized the extent of control he had over Mr. Dixon, he escalated this behavior. On multiple occasions, Mr. Perry sexually assaulted Mr. Dixon, including one instance where he forcibly pulled off Mr. Dixon's clothing, groped his buttocks, and attempted to force himself on Dixon. Mr. Dixon told a drunken Perry "No," and attempted to remove Mr. Perry's hands, but Mr. Perry held tightly onto Dixon's wrists. Mr. Dixon was only able to escape after de-escalating the situation by abruptly changing the subject.

20.     The day after the assault Mr. Perry called and texted Mr. Dixon relentlessly. Saying "Tried you. Call me," and "I really need to talk to you please call as soon as you can." Finally, when Mr. Dixon answered Tyler Perry's call, Mr. Perry profusely apologized for the sexual assault while blaming it on other things. Perry continued, he "didn't know why [he] would do that. Maybe [he] was self-sabotaging." **On the very same call where he apologized for the sexual assault against Dixon**, Perry told Dixon, "And don't worry, we're gonna do your show," referring to the pilot that Perry knew Mr. Dixon had desperately wanted to produce.

21.     Shortly thereafter, Mr. Dixon got a call from Perry's lawyer saying that "Christmas had come early" and that Dixon was getting a substantial raise, and the show was greenlit. Perry's attorney explicitly warned Dixon not to tell any other actor on the show about Dixon's raise because no other actors were getting a raise, only Dixon.

//
//
//
//
//

22.     Perry kept telling Dixon that he was sorry and that the harassment would not happen again. However, the harassment and assaults continued. Mr. Perry would also try to deflect the blame for the sexual assault by saying that Dixon didn't have a strong enough "No."



23.     Perry told Dixon that "you have to be able to say no [to propositions for sex]. And mean it and make it clear."

24.     Dixon did not know how to answer without facing retaliation, cancellation of his production contact, or perhaps being killed of the show. So instead, Dixon made a joke out of the situation stating that "I'll only say yes [to sex] if it gets me an Oscar."

25.     In response Tyler Perry stated, "the only one who could have gotten that [the Oscar] **for you through sex** is in prison. So just stick to the no. Unless you are really into him." (emphasis added).

26.     Perry reveals through these text messages that the "No." he was referring to was Dixon's "No." to sex in exchange for promotion in the industry – classically known as quid pro quo sexual harassment. Perry sent this message to Dixon because that is exactly what Tyler Perry was doing. At some point Dixon left Atlanta and moved to Santa Monica to create distance from Tyler Perry. However, even at long distances, Mr. Perry continued to sexually harass Mr. Dixon.

## **PARTIES**

27.      Plaintiff DEREK DIXON ("Plaintiff") is an individual who resides in the State of California.

28.     Defendant, TYLER PERRY is an individual who resides in both the State of Georgia and in the State of California and has extensive business contacts in the State of California so that he has conducts substantial, continuous, and systematic business activities in California.

29.     Defendant, TPS PRODUCTION SERVICES, LLC ("TPS") is a Limited Liability

LAW OFFICES OF JONATHAN J. DELSHAD, PC

LAW OFFICES OF JONATHAN J. DELSHAD, PC

Company doing business in the state of California but is headquartered in Georgia.

30.     Defendant AND ACTION, LLC is a Limited Liability Company doing business in the state of California but is headquartered in Georgia.

31.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through 50 (collectively with TPS PRODUCTION SERVICES, LLC, AA and TYLER PERRY, the "Defendants" or "Defendant"), inclusive, and therefore sues these Does by such fictitious names under California Code of Civil Procedure § 474. Plaintiff will amend this Complaint to allege their true names and capacities when the same are ascertained.

32.     Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is legally responsible in some manner for the occurrences herein alleged and that the injuries of Plaintiff as herein alleged have been proximately caused by the aforementioned defendants, and each of them.

33.     On information and belief one or more Defendant is the full or partial parent or owner of, a wholly or partially owned subsidiary or division of, the agent of, the alter egos of each other, and/or subsidiaries or divisions of an unknown and unnamed parent or holding enterprise.

34.     Plaintiff is informed and believes and thereon alleges that each of the Defendants named herein has at all times relevant to this action been the officer, agent, employee and/or representative of the remaining Defendants and has acted within the course and scope of such agency and employment, and with the permission and consent of the Defendants.

35.     Plaintiff is informed and believes, and thereon alleges, that each of said Defendants is responsible, jointly and severally, for the events and injuries described herein and caused damages thereby to Plaintiff as alleged herein as the operations of each Defendants together with the other ones consist of an integrated enterprise with centralized operations such that the parent has substantial control over the subsidiary's employment practices and the hiring and firing of employees.

36.     On information and belief, it further is alleged that the Defendants were at all times relevant hereto, the alter egos of each other such that to affirm the legal separateness of the Defendants for purposes of the claims presented in this action would lead to an injustice and/or inequitable result.

There is a unity of interest and ownership between the company and its equitable owner(s) that the separate personalities of the company and its shareholders do not in reality exist. Defendants exhibit an interrelation of operations, commingling of funds, lack of observation of corporate formalities, undercapitalization, centralized control, common management, and common financial control such that they are an integrated enterprise and/or are alter egos. The company is a mere shell, instrumentality, and conduit through which the individual Defendant(s) carried on their business, exercising complete control and dominance of such business to the extent that any individuality or separateness of the Defendants does not and did not exist.

37.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the defendants was acting as the partner, agent, servant, and employee of each of the remaining defendants, and in doing the things alleged herein was acting within the course and scope of such agency and with the knowledge of the remaining Defendants.

<u>**VENUE AND JURISDICTION**</u>

38.     This Court has personal jurisdiction over all Defendants because they have purposely availed themselves, are residents of the State and/or conduct business in California and this lawsuit arises out of acts that occurred in California and relates to their contacts with California. Further, the vast pattern of abuse, including sexual assault, harassment, and inappropriate, in addition to wielding control and power over a Plaintiff was consistently present when Defendant Perry engaged in the most recent acts described herein. The location of all events herein alleged occurred within the jurisdiction of California.

39.     Plaintiff was harmed and injured in California by Defendants.

40.     The California Superior Court also has jurisdiction in this matter because the individual monetary damages and restitution sought herein exceed the minimal jurisdiction limits of the Superior Court and will be established at trial, according to proof.

41.     Venue is proper in Los Angeles County pursuant to CCP §395 (a) and CCP §395.5 in that liability arose there because at least some of the transactions that are the subject matter of this Complaint occurred therein and/or each Defendant either is found, maintains offices, transacts business, and/or has an agent therein.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

42.     This action is also timely under California's Sexual Abuse and Cover Up Accountability Act. California's Sexual Abuse and Cover Up Accountability Act (AB-2777) amended California Civil Procedure Section 340.16, extending the statute of limitations, opening up revival windows for adult survivors of sexual assault and related claims and acknowledging that a "two-year statute of limitations simply does not provide sexual assault survivors adequate time to heal from the physical and emotional trauma of a sexual assault and prepare for a civil case."

43.     Mr. Dixon was a resident of California from January 2023 through the end of the relevant time period and the sexual assault and harassment of Mr. Perry continued and extended into the relevant time period where Mr. Dixon was a resident of and working from California for Mr. Perry.

44.     Mr. Perry also resided in California.

45.     Much of the harm caused by the sexual assaults occurred in California.

46.     On information and belief, Defendant Tyler Perry has engaged in similar sexual assaults from California.

47.     California has a strong interest in allowing its residents to recover for injuries sustained, even if the claim would be time-barred in another state.

48.     Additionally, California law provides specific revival statutes for sexual assault claims, such as Cal Code Civ Proc 340.16, which revives certain claims that would otherwise be time-barred. If the plaintiff meets the statutory criteria, including allegations of a cover-up by an entity legally responsible for the assault, the claim may proceed under California law, even if it would be barred under Georgia law.

49.     Mr. Dixon was a California resident while performing work for Tyler Perry from January 2023 until his termination and is currently domiciled in California.

## FACTUAL ALLEGATIONS

50.     In or around September 2019, Plaintiff worked for an event company called Legendary Events in Atlanta that was hired to organize Defendant Perry's studio opening party (the "**Party**"). Plaintiff was recruited by Tony Conway, the owner of Legendary Events and close friend of Tyler Perry. Mr. Conway decided to place Dixon directly in a role at a party that required frequent conversation with Tyler Perry.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

51.     Defendant Perry picked Plaintiff out of a crowd of employees present at the Party, and began asking Plaintiff questions about his employment status, and whether Plaintiff was an actor.

52.     In or around early October, and on the last day of the Party, Defendant Perry insisted that he and Plaintiff exchange phone numbers, and Perry subsequently texted Plaintiff to introduce himself. Perry began by asking Dixon about his dreams and aspirations.

53.     Dixon told Perry that he was interested in acting and writing.

54.     Perry then told Dixon to do an audition over the phone and send it to Perry. Dixon told Perry he was at a Halloween party. Perry asked to see pictures of Dixon in costume and Dixon complied. When Perry saw the pictures, he texted Dixon "I was gonna say. Your cowboy needs a sugar daddy." Perry continued with, "You look great. You're just lacking costume parts. Sorry don't want to offend." Dixon responded, "Not at all. It's so true. Half-assed costume." To which Perry replied, "What's true? Cowboy needs a sugar daddy?" implying that Perry wanted to be Dixon's sugar daddy. Dixon quickly shut down those comments by reiterating what he said earlier that the truth was that he was lacking costume parts.

55.     Shortly thereafter, Dixon's boss at Legendary Events called Dixon and told him that Tyler Perry was having another event in Los Angeles and specifically wanted Mr. Dixon to fly from Atlanta to Los Angeles to work on the event. Excited for the opportunity to fly to Los Angeles, Dixon was flattered and jumped on the opportunity to meet Tyler Perry again.

56.     Shortly after doing the event, on November 3, 2019, Defendant Perry sent Plaintiff several text messages that he "would love to find [Plaintiff] a job," and "change [Plaintiff's] life," insisting that they should "make it happen." Perry sent Dixon what turned out to be an ominous warning, "**Be careful hanging around me**!! I cause dreamers to dream bigger!! I cause them to not only believe but do!! Then let's make it happen. You're an artist. **You have to be fulfilled**. Nothing else will suffice."

57.     The very next day, Defendant Perry sent an email which contained an offer for Plaintiff play the role of "Dale" in Perry's television series "Ruthless." Perry said it was a small role that could get a lot bigger, thereby setting up the first stage in a series of escalating quid pro quo offers.

58.     At this point, Dixon did not know that Perry was interested in men or that he was looking

LAW OFFICES OF JONATHAN J. DELSHAD, PC

for a sexual relationship. Dixon assumed that Tyler Perry was genuinely a caring person who discovered the talent that Dixon always felt he had.

59.     Dixon filmed his roles in "Ruthless" in mid-November and went back to his job as an event staff for Legendary Events.

60.     Approximately one month later, Perry bought and gave Dixon a new car because he hated Dixon's jeep. Dixon was surprised and elated. Dixon had no idea that he was being set up by Perry for extreme dependence.

61.     In December of 2019 Dixon was requested to be part of the event staff at another event at Perry's home in Jackson Hole, Wyoming. After that event, Perry started frequently sending text messages, making phone calls, and demanding that Dixon "give [Perry] some attention."

62.     On New Years Eve, 2019, Tyler Perry texted Dixon "I can't tell you the last time I pumped gas. Or went to the supermarket. Or fly commercial. Or packed a bag. **Or had good sex**. It was before I was rich."

63.     Dixon found these messages to be strange and untowardly coming from someone like Tyler Perry. But being new to the industry, Dixon played along by downplaying the sexual comments and hoping that being around Perry would allow him to showcase his talents as an actor and writer.

64.     Soon after Dixon began giving Perry more attention, Perry made his move on Dixon.

65.     In January of 2020, just a few months after his first acting gig, Perry invited Plaintiff to his home in Douglasville County, Georgia. Plaintiff showed up to the home hoping that he would be given a chance to befriend Perry and show him how talented an actor Dixon was. At Perry's home, Dixon was served many alcoholic drinks which Perry also partook in. Dixon felt that Perry was genuinely interested in Dixon's talents as an actor and writer.  Perry made no sexual advances at Dixon while they were drinking, and the conversation was friendly.

66.     At the end of the night, Perry told Dixon not to drive home. Perry said it was dangerous and that Dixon was too "inebriated" to drive home. Dixon agreed and was escorted to a separate guest room, not knowing that this was a ruse to allow Perry to assault Dixon. Dixon was tired and did not have pajamas and so he got into bed only wearing underwear.

67.     Before he knew what was happening, Dixon felt someone else slip into bed behind him

LAW OFFICES OF JONATHAN J. DELSHAD, PC

and start rubbing Dixon's body around his inner thigh in a highly sexual and suggestive manner. Dixon turned around and saw that Tyler Perry was in bed with him.

68.    At this point, Dixon's stomach started to turn, and he began feeling nauseous. Instinctively, Dixon jumped out of bed and told Tyler Perry that he "wasn't that sexual." Tyler Perry ignored the comments and told Dixon to turn around so Perry could see him naked in his underwear. Perry then commented on how beautiful Dixon's body was.

69.    Dixon once again told Perry that he was not into sex. Dixon kept informing Perry that he was not into sex in order to keep Perry at bay while at the same time not insulting the person who was dangling his career in front of him.

70.    In response to Dixon's frequent assertions that Dixon was not into sex, Perry started prying further. Perry would send Dixon a text message saying, "I would hope that you would let some one[sic] hold you and make love to you. You are missing the best years of your life my friend. Trust me. I hope you get past that block in your mind soon." Perry was implying that Dixon would hopefully get



past the block in his mind and would let Tyler Perry make love to him.

71.    After that assault in January, Dixon felt betrayed. Perry continued to call or text Dixon every day asking to talk to him more. Dixon ignored Perry which led Perry to text him "Derek. Why don't you text me more?"

72.    The more Dixon ignored Perry, the more aggressive Perry became until finally Perry offered Dixon a part in a new show called "The Oval."

73.    Dixon was intrigued and was hoping that this would be the big break that he was looking for and a chance for him to display his acting talent.

74.    On February 11, 2020, Perry told Dixon to quit his job at Legendary Events and come work

LAW OFFICES OF JONATHAN J. DELSHAD, PC

exclusively for Perry. Perry was not able to control Dixon so long as Dixon had a secondary income that was providing for his basic needs.

75.     Once Dixon quit his job due to his role on "The Oval" Perry started getting more and more personal with Dixon knowing that Dixon was now under his control.

76.     Perry would often say things like, "I give and give and give and no one every does anything for me in return. No one ever gives me what I want or what I need," implying that Dixon was not giving him sex.

77.     Perry started asking Dixon about Dixon's sexual preferences, and what role Dixon took on when engaging in sexual acts (i.e. whether he was a top or bottom - which in sexual terms means whether Dixon preferred to give or receive anal sex).

78.     Perry further indicated to Dixon that he had sex with men before and that "he was a top." Perry further told Dixon that "when you have a big dick and when you hit the G-spot right on these bottoms, they go crazy."

79.     Perry further told Plaintiff that he wanted a man who was in a relationship with another individual but with whom he could be emotionally involved and engage in sexual acts with — like a "friend with benefits" relationship — because Perry did not have time to deal with the emotional aspect of a relationship, only the physical.

80.     Despite these comments, Dixon knew that a full-throated refusal would land him in the doghouse and might result in his role being cut on the "The Oval." Fearing that his career would end before it began, Dixon put up with these comments and continued to maintain that he was not the sexual type.

81.     On or around March of 2020, Dixon received the script for "The Oval." He was written in as a season regular and was therefore expected to quit his job with Legendary Events.

82.     Dixon's character was written as a gay, homeless, and desperate store clerk who had to sleep with one of the other characters for a place to stay. More importantly, at the end of the season, his character would be shot four times in the chest. Dixon felt that this was a way for Perry to test Dixon out for a year and see if he would be loyal to Perry.

83.     When Dixon asked Perry about the shooting, Perry indicated that if Dixon did a "good

LAW OFFICES OF JONATHAN J. DELSHAD, PC

job," Dixon would be back, and that a shooting didn't necessarily mean that Dixon's character was out of the script for future seasons. Perry commented that Dixon's character was only shot in the chest, not in the head.

84.    Dixon immediately understood that his job security depended on his "relationship" with Perry. From this point on, Dixon worked with the constant fear of losing his job if he did not engage with and endure Perry's sexual harassment.

85.    Shortly after giving Dixon this news, and after telling Dixon that future seasons were dependent on Dixon doing a "good job," Tyler Perry invited Dixon to his home in Atlanta.

86.    Plaintiff asked questions and tried to wiggle his way out of the invitation because he remembered what happened the last time the two were alone. However, Plaintiff knew that his job security, income and livelihood depended on his attendance.

87.    Plaintiff had seen other employees of Perry's who had experienced sudden "deaths" on the show when they fell on Perry's bad side.

88.    In fact, Perry had made it clear to Dixon that he would often kill characters in order to get an actor to be loyal or obedient.

89.    When Dixon arrived at the house, Tyler Perry gave Dixon a warm welcome and was very friendly. Soon after, Tyler Perry started asking Dixon a slew of sexually charged questions, even asking if Dixon "liked it rough in bed."

90.    Perry then physically reached out and violently grabbed Dixon's throat attempting to physically choke Dixon and remarked "Wow! Look how excited you just got! You do like that!"

91.    Dixon was horrified, shocked and in a panic. Dixon never thought that Tyler Perry could get so violent and would place his hands on Dixon's throat in a sexually aggressive manner.

92.    Dixon did not enjoy or consent to any of this conduct. Dixon was in shock and took steps to immediately deescalate the situation.

93.    Due to the onset of the COVID-19 pandemic in March 2020, filming for the Oval was postponed indefinitely.

94.    During the period in which filming for "The Oval" was postponed, Tyler Perry would make FaceTime calls and other contacts to Dixon almost every day, treating Dixon as his on-call "pet."

LAW OFFICES OF JONATHAN J. DELSHAD, PC

- 15 -

Dixon felt obligated to answer for fear of losing his role, income and career. Perry often asked about Dixon about his whereabouts, often demanding that Dixon respond immediately. When he didn't, Perry would send text messages to Dixon stating, "DEREK!!!," "GRRRRR!!!!," and "What are you doing!!"

95.    Additionally, Perry was jealous of anyone who Dixon had a relationship with. Tyler Perry told Dixon that if Dixon got COVID-19 from his roommate at the time, Dixon would not be able to shoot the Oval. Perry encouraged Dixon to move into one of the on-set studio houses owned by Perry, where Perry would have more control over Dixon's whereabouts.

96.    Thereafter, Perry would text Plaintiff about other actors on his show, "Ruthless."

97.    Perry told Dixon how he manipulated employees through ruthless retaliation. Perry told Dixon that if he did not like the way an actor behaved or the way the actor was acting, the character would simply "die in season 2."

98.    Dixon understood that Perry was informing Dixon to be cautious about disappointing or upsetting Perry. As a result, Dixon continued to put up with Perry's suggestive messages and sexual advances while doing his best to protect himself by taking notes and amassing evidence of the sexual harassment and keeping old text messages.

99.    In one conversation in or around April of 2020, Perry told Dixon that Perry imagined Dixon prancing around in a cowboy outfit, and that Perry did things to Dixon and that he couldn't talk with Dixon about any further because they were "so wrong."

100.    In or around April of 2020, and while Dixon was living in the studio homes on set, Perry often coerced Dixon to drink alcohol and then get on the phone with Perry. Perry would frequently have someone drop off alcohol at Dixon's door. Perry would eventually turn these phone calls into sexually explicit rants. Perry would get frustrated with Dixon and tell Dixon that he was not giving Perry "what he needs." Dixon's refusal to succumb to Perry's sexual advances caused Perry to be ever more frustrated.

101.    Eventually, Perry warned Dixon that if Dixon told his castmates about the harassment, Dixon would be opening himself up to lots of "questions and foolishness," and demanded that Dixon not discuss any of their conversations with his castmates.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

1    //

2    //

3    102.    Perry upped the stakes by

4    telling Dixon point blank that he

5    was not to tell anyone about their

6    "friendship." Perry told Dixon that

7    it should all remain a secret, and

8    tried to make it seem like this

9    secret was for Dixon's benefit.

10    103.    Perry    continued    to

11    sexually harass Dixon. On June

12    27, 2020, Defendant Perry texted

13    Dixon that all he wanted for his birthday were "Biscuits and BJ's…" (referring to blowjobs/oral

14    sex) but that all Perry ever received were biscuits, insinuating a request for oral sex from Dixon.

15    This text was followed by other messages calling Dixon "cute," "cutie," and that Perry was "just

16    thinking about" Dixon.

17    104.    Despite these advances, Dixon continued to act professionally and continued to tell Perry

18    he was not sexual. That seemed to be the only way of keeping Perry at bay while keeping his job.

19    105.    In July of 2020, Perry remarked about how much he loved the script for Dixon's television

20    series called, "Losing It," and exclaimed that he wanted to shoot the pilot for it ("Pilot"). Perry

21    would never really work toward that goal, and what Perry was really doing was making Mr. Dixon

22    more dependent on Perry, so that Perry could later extract sexual favors from Dixon as a quid pro

23    quo to produce the Pilot.

24    106.    In or around August 2020, Dixon and his castmates began shooting for the Oval after delays

25    due to the COVID-19 pandemic, during which time all castmates and crew lived on the studio set

26    in a 'quarantine bubble.'

27    //

28    //

LAW OFFICES OF JONATHAN J. DELSHAD, PC

COMPLAINT

107.    Shortly after, Perry confided in Dixon that two cast members were "pissing him off," and that Perry swore that he knew "HOW TO FIX THIS SHIT." Perry added that he "love[s] killing a mother fucker in a show that no one expects," that he was "going to shoot



them all shot," and "kill them mofos [sic] characters," referring to killing off characters in the Oval played by actors who Perry wanted to retaliate against.

108.    More importantly, Perry stated in one text message "I may need to shoot the shoot out early." Which Dixon understood to mean that unless the actors knew they were going to die and that their time on the show was over, they wouldn't



change their ways. Perry was going to film the shoot out early so that the actors would be more submissive to Perry's requests.

109.    Perry intentionally made these comments to instill fear in Dixon. Mr. Dixon now knew that he too would lose his job if Dixon did not "play ball" with Perry's sexual harassment. This is what

LAW OFFICES OF JONATHAN J. DELSHAD, PC

Perry had been setting up. Dixon was now fully reliant on Perry for his income, hope, and future aspirations. Perry made it clear that Dixon was not to disclose the relationship to anyone else, and Dixon was aware that Tyler Perry would kill him off the show for good (thereby ending his career) if Dixon got on Perry's bad side. To top it all off, Dixon already knew that his character was shot 4 times at the end of the seasons, but that the shots "might" not be fatal.

110.    In July of 2020 Perry read the script of Dixon's Pilot and told Dixon that he loved the show so much, he wanted to shoot the pilot for it. Dixon did not know that that Perry never intended on shooting the show. Perry knew that he could use the motivation of shooting Mr. Dixon's show to get Dixon to do what Dixon had been resisting for many months, which was to give Perry the sexual gratification Perry so craved.

111.    Once the stage was set, Perry knew he could get away with sexual harassment. During the filming of the Oval in 2020, Perry engaged in a severe and pervasive tirade of sexual commentary including but not limited to:

      a.    that Dixon "liked being choked," (following Dixon's being choked by a cast member in one scene on the Oval.)

      b.    "Why do you twist your hips when you walk,"

      c.    "How can I get a day of Dixon,"

      d.    "When will you be thick again?"

      e.    "I love how I feel right now but I don't like being horny,"

      f.    "I feel sorry for the first person who flirts with me,"

      g.    "I've been trying to put that energy somewhere else, but everything is sexual on this stuff,"

      h.    "That snake across the table made me think of [photo of Nicki Minaj from the music video for her song "Anaconda" in which she references intercourse with male genitalia symbolized by a snake.]"

      i.    "I will gladly chock [sic] you right now," (referring to Perry's desire to choke Dixon in a sexual way),

      j.    A suggestion that Dixon should get braces behind his teeth, but that Plaintiff would

LAW OFFICES OF JONATHAN J. DELSHAD, PC

have to "give up BJs," and that it could "be dangerous for [Dixon's] partner, especially if they're not circumcised."

k.    "That's when you were thick Derek. Fun Derek. Drunk Derek. Before Covid Derek. I miss him. Just without a butt," and

l.    "Thick Derek woulda [sic] worked them pants out,"

112.    Perry also photographed Dixon's buttocks while on set and sending the pictures to Dixon. Two text messages of many, show that Perry was jealous of seeing Dixon with other men and that Perry describes Dixon as "so beautiful."



113.    This series of comments and other unwanted sexual references made Dixon highly uncomfortable. Dixon was caught in a bind. He could not complain to anyone in HR. He had nowhere to turn for relief from the sexual harassment and he knew that if he did not endure it, he would be killed off from "The Oval." Dixon was unsure whether to joke back or rebuff Perry's sexual harassment, so he endured it knowing that his job was on the line if he did not engage.

114. Perry would also share intimate details of his own sex life with Dixon. Among other things, Perry would tell Dixon that he had not had good sex since he became rich and that there were certain times where he had not been "touched" in months.

115. On the second to last day of shooting for "The Oval," Dixon filmed the episode where his character was shot four times, indicating a seeming end to his role on the show and his termination from the job.

116. It was precisely following this day of filming when Tyler Perry knew that Dixon's character's fate was to be decided that Perry invited Dixon to his trailer for drinks. Dixon knew that refusing meant the end of his career, so he accepted.

117. It was there, on the very same day that Perry dialed up the harassment to a new level. Tyler Perry asked Derek Dixon point blank, "Are you attracted to me?" and demanded that Dixon answer. Plaintiff reiterated the same way he did after the first assault, by skirting the question. Dixon told Perry that Dixon "wasn't that sexual or looking for anything." Perry's incessant probing did not stop. Perry continued to talk about how "good-looking" and "sexy" Dixon was, and that Plaintiff was "wasting his looks" by not "being free and having sex."

118. Dixon repeatedly deflected these comments with neutral answers, constantly looking for ways to avoid Tyler Perry's sexual interrogation, while continuing to worry about his future on "The Oval." Mr. Perry was testing how far he could go with Dixon.

119. After enduring the harassment and doing his best to dodge the situation, Mr. Dixon got up and the two exchanged goodbyes. As Dixon was leaving Perry's trailer, Perry got up and pinned Dixon against the wall. Perry began aggressively groping Dixon's buttocks in a sexual motion. Tyler Perry began reaching down towards Dixon's buttocks and groped Dixon's butt in a strong

LAW OFFICES OF JONATHAN J. DELSHAD, PC

and sexual manner that could not have been a mere accident. Dixon stood frozen in horror and could not reciprocate or fight back. All Dixon could do was let his body go cold and limp. Seeing that Dixon had no desire in Perry, Perry told Dixon that he was "drunk" and asked Dixon to leave the trailer.

120.    As soon as Derek Dixon left the trailer following Perry's violent assault, Dixon became severely nauseous and extremely anxious about his job, career, and livelihood. Dixon felt trapped within the confines of the studio's quarantine bubble. There was still another shoot the next day. Dixon called his friend Justin Bryant on the phone and told him everything that happened, and was unaware of any Human Resources representatives to whom he could report the assault. Plaintiff had no one to turn to and nowhere to go to save him from Perry's aggressive sexual harassment and exploitation.

121.    The next day, Perry acted like nothing happened and this time he did not even offer Mr. Dixon an apology.

122.    Following this exchange, Dixon began to avoid Perry as much as possible. However, Dixon still felt the need to answer Perry's incessant text messages, so he changed his approach. Dixon often pretended to be asleep to avoid being harassed by Perry. However, Perry persisted by texting Dixon the following messages:

    a.    "Are you awake?"

    b.    "Stop ignoring me."

    c.    "You are awake. Derek."

    d.    "WAKE UP. I KNOW YOU'RE NOT SLEEPING," and

    e.    "Give me attention.".

123.    In or around early October of 2020, Perry "invited" Dixon and other actors from the Oval on a "cast trip" to Perry's personal island in the Bahamas. Dixon knew, as did everyone else on the show, that declining to go on this trip might cause Perry to erase you from the show. Dixon agreed to go, knowing that the whole cast was going to be there.

124.    One night while in the Perry's private island in the Bahamas, the cast was having a party. At the end of the night, Perry told Dixon that he wanted to talk to him. Dixon was caught off guard.

Perry made alcoholic drinks and forced Dixon to drink with him. Dixon knew that he could not refuse the drinks, otherwise he would risk upsetting Mr. Perry. Instead, Dixon tried to stay in control and sipped drinks slowly.

125.    Tyler Perry did not control himself. He drank until it was clear that the alcohol had made him bold and sexually aggressive. Perry told Dixon that he wanted a relationship with someone who could be emotionally and sexually available to him but would also be permissive of Perry having his own relationship with someone else. Perry said he could see himself having that type of relationship with Dixon. Perry insisted that Dixon needed to be with someone rich because Dixon liked nice things. Perry told Dixon that he was watching all the cast as they laid out in the sun with tanning oil. Perry continued raving about how seeing Dixon "greased up like that" was driving him crazy. Tyler Perry said he would've burnt the whole island down if one of the other actors or anyone else from the group had touched Dixon that night.

126.    At that point, he once again aggressively seized Dixon and groped his buttocks. Dixon once again did not reciprocate and froze up. Perry got the message and told Dixon to go to bed. Dixon was terrified and could barely sleep.

127.    From that moment on, Perry became extremely frustrated and possessive.  Perry wanted desperately for Dixon to be attracted to him, but Dixon was not.

128.    In one exchange Perry sent pictures of himself from the Bahamas to Dixon. Dixon responded that the water looked nice. Perry got upset that Dixon did not see the "stud" in the picture and instead focused on the water. Perry called Dixon an "asshole" for "laughing out loud" at Perry's desire for Dixon to call him a "stud."



LAW OFFICES OF JONATHAN J. DELSHAD, PC

129.    On or around October 18, 2020, and following Dixon's return from the Bahamas, Perry told Dixon that he was jealous that Dixon was giving too much attention to other men. Perry stated that Dixon was being too much of a "social butterfly," and that he would need Dixon to "sit still this week," further attempting to exercise his influence over Dixon's interaction with other men. Perry continued to wield his position as Dixon's boss demanding sexual attention in exchange for his continued employment.

130.    These text messages were followed by others to Dixon like "Derek. Don't you dare ignore me. I deserve better. I deserve attention all the time." Dixon, out of fear for the unknown future of his career, continued to give Perry the social attention he demanded even though Dixon would constantly get sexually harassed.

131.    On several occasions, Perry would text Dixon while drunk. In one exchange Perry told Dixon, "You know what I cook[?] … Derek" and then proceeds to say "I'm so drunk. Talking shit."



132.    In December of 2020, Dixon began feeling depleted due to Perry's continued pattern of sexual harassment. The assaults and harassment began manifesting in his physical health, and Mr. Dixon had no one to turn to. Dixon visited a physician who indicated that Dixon's exhibited severe symptoms of acute stress, insomnia, stomach issues, and dangerously low cortisol levels due to the sexual harassment and assault. The physician prescribed Zoloft, an anti-depressant, for Dixon's ailments.

133.    The sexual harassment continued through the beginning of 2021. Perry continued sending Dixon unsolicited photos of Dixon's body from the set of "The Oval," with comments such as:

    a.    "Oh, my G-d look at think [sic] Derek. Thick."

    b.    "No. The weight difference. I can do see it."

    c.    "Thick Derrick. [sic] Ok. Good."

LAW OFFICES OF JONATHAN J. DELSHAD, PC

d.    "Nope. I can't deal with thick Derrick [sic]. Lol."

e.    **"What's it going to take for you to have guiltless sex? Have you found that yet in therapy?"**

f.    "What's your waist? I'm so glad think [sic] Derek us back. Is. With us."



g.    "Break out in ass and thighs,"

h.    "You home? I don't want you out with your 'friends'. Drinking."

i.    **"You are the rose. But you are so blocked that you refuse to be smelt [sic] or opened."**

j.    "…when you finally are able to unlock your mind, you're going to make that person crazy. Crazy in a good way."

k.    "Have you been intimate with someone?"

l.    **"Why did that photo [of Plaintiff and another cast member] make me jealous. You two together."**

m.    "Thick Derek. Get that Chipotle. No, I can't. Only from your jeans."

n.    Derek is there "To make men swoon."

o.    "What I mean by that is that **you're so beautiful, when you finally are able to unlock your mind you're going to make that person crazy**" "Crazy in a good way." Dixon responded, "As long as my face doesn't get messed up. As long as it doesn't leave a mark." And Tyler Perry responded "What will leave a mark Derek. **Say it. On your neck**?" What do you mean you haven't? Have you been intimate with someone?"

p.    **"I can't wait get that phone call from you when you tell me you let go and you loved every min [sic] of it,"** (referring to Plaintiff's desire to openly engage in sexual encounters.)

q.    **"No Straight man would be going on walks with you or cooking dinner for you**

**unless they wanted to fuck you. I would fuck you."**

r.    **What are you doing hanging out with that girlfriend of yours "She wants you too… Everyone wants to fuck Jacob,"** (referring to Dixon's character in the Pilot of "Losing It.")

134.    After several weeks of unreciprocated sexual innuendos and demands for attention, Perry lashed out at Dixon on set and asked if he needed to "punch [Dixon] in the stomach," for Dixon to act the way Perry envisioned in a scene. This exchange was highly tense, and Perry's reaction stunned several cast members. Actors on set consoled Dixon for the abrasive interaction, confused as to why Perry overreacted in such a manner. But Dixon knew that Perry was lashing out due to his frustration at the lack of attention Dixon was giving him.

135.    On or around June 4, 2021, Perry invited Dixon to his house to spend some time together and discuss the pilot of "Losing It." Although Dixon hesitated, he feared the consequences of disappointing Perry and believed once "Losing It" was a big show, he would be freed from under the clutches of Perry.

136.    During this visit, Perry made several alcoholic beverages for himself and demanded to know why Dixon was not having sex with anyone. Perry probed further about Dixon's sex life, insisting that the two were becoming increasingly drunk and it was time to end the night.

137.    Perry then led Dixon to a guest house where a guest bedroom was. Dixon would be staying there that night. Inside the guest bedroom Perry motioned to Dixon to come see a weight monitor that he had. Perry told Dixon that for the monitor to work, Dixon would need to step on the monitor wearing only his underwear and pushed Dixon to try it out. Dixon tried to avoid the uncomfortable situation but decided it was better to comply and hurry to bed than to wait for the alternative at that point.

138.    After weighing himself, Dixon walked toward the guest bedroom, followed by Perry, who then asked Dixon for a "good night" hug. Rather than arguing, Dixon complied, at which point Perry reached out and yanked Dixon's underwear down from behind.

139.    Perry then began to vigorously grab, grope, and play with Dixon's buttocks in a sexual manner. Dixon was naked, stunned and seized by tremendous fear. Dixon started to tell Perry that

LAW OFFICES OF JONATHAN J. DELSHAD, PC

he "did not want [his] underwear down," that Dixon "didn't want to be naked," and that Dixon "didn't want this."

140.    Dixon quickly reached to pull his underwear back up. As soon as he did, Perry grabbed Dixon's reaching arm with a tight grip and held fast. Tyler Perry told Derek Dixon to "Relax," and to "**just let it happen**," and that Perry **"wasn't going to hurt** [Dixon]." Perry continued to sexually grope Dixon's buttocks.

141.    Dixon's anxiety rapidly escalated, thinking that might soon be raped. Dixon was not sure what to do and his breath shortened. Perry ignored Dixon's refusals and held Dixon's hand fast, preventing him from reaching for his underwear. Dixon was naked, and being groped by a large, drunk, and sexually frustrated 6'5" man who had Dixon in his clutches.

142.    Dixon did not know if he was going to have to get into a physical fight, but he knew that any efforts to fight back were hopeless. Perry had armed security at his gate, was much larger than Dixon, and told Dixon that he had several guns in his home.

143.    Dixon was desperate for a way out and remarked that he couldn't do anything sexual because he was so hungry, attempting to change the conversation. Dixon asked, "Is there any food up here?" which prompted Perry to withdraw and order a pizza. Dixon, in fear of his safety, followed Perry into the main house to eat the pizza. Afterwards, Dixon returned to the guest house, and, unable to lock the bedroom door, locked himself in the guest house bathroom and slept on the floor. Dixon then attempted to contact some close friends about the incident.

144.    The following morning, Dixon realized that he had left his car keys in the main house, and upon going to retrieve them, encountered Perry. Perry told Dixon that last night's incident was "why [the two] shouldn't drink together," and that the previous night's incident "shouldn't have happened." Dixon responded, saying "Oh, so that was my fault?" to which Perry replied, "No, no, no, I'm not saying that. I'm just saying that shouldn't have happened and I drank too much," attempting to excuse himself for grabbing Dixon's buttocks, groping Dixon, and attempting to have sex with Dixon against his will. At this point, Dixon left Perry's home uncontrollably shaking and contacted his close friends to discuss the unspeakable horror from the night before.

145.    For the next several days, until June 6, 2021, Perry texted and called Dixon incessantly

LAW OFFICES OF JONATHAN J. DELSHAD, PC

with messages asking Dixon to call him or answer his calls. Finally, Dixon answered, at which point Perry began to apologize, blaming the testosterone supplements he was taking at the time. Perry had confided in Dixon about these supplements in past messages and decided to use them as a scapegoat for his actions. Dixon emphasized that he was "not okay with what happened," and that he had "never asked [Perry] for anything," to which Perry replied, "I know, that's why I like you."

146.    Perry further attempted to rectify his misconduct by inviting Dixon on a yacht trip and telling Dixon that Perry was for sure going to make Dixon's Pilot. Dixon realized that Perry was offering to make "Losing It" to effectively silence Dixon.

147.    Perry sent a text message trying to arrange for Dixon to come on his yacht with another person so that Dixon would feel more comfortable.

148.    Dixon responded that he would not board the yacht and refused Perry's invitation.

149.    After Dixon refused to go on the yacht, Perry did not text Dixon for five months. Sensing that Dixon was upset, Perry called Dixon once to update him that Perry was looking for a director for the Pilot.

150.    During this five-month period, Dixon was regularly in therapy. He suffered from severe depression, anxiety, stomach pains, and nausea, resulting in a new prescription for another anti-depressant. Dixon was diagnosed with Post Traumatic Stress Disorder, and his therapist





LAW OFFICES OF JONATHAN J. DELSHAD, PC

recommended that he seek outpatient treatment costing upwards of $20,000, a price too high for Dixon at that time.

151.    During that time, Dixon began speaking with people about the sexual assault and was assessing his rights.

152.    As soon as Perry realized that Dixon was done talking to him, Dixon got a message from Perry's "fixers."

153.    Perry's "fixers" contacted Dixon indicating Dixon's character in "The Oval" (the one who was shot) would be returning with a new story line next season and Dixon was receiving a graduated raise from $10,000 per episode to $16,000 per episode that would continue to increase to upwards of $19,000 per episode over the coming seasons. The attorneys said that "Christmas came early" for Dixon, because he was "doing a good job" on "The Oval."

154.    However, they also told Dixon he was **forbidden from letting his castmates know about the raise,** because nobody other than him would be receiving a similar pay increase.

155.    Lastly, the "fixers" told Dixon that Perry wanted to buy the right to produce the Pilot of "Losing It" and planned to spend up to $1,000,000 producing the Pilot.

156.    Dixon immediately knew why he was getting this raise and why the Pilot was being produced. He knew he could keep the money and the job or complain about the sexual harassment, but not both.

157.    The situation facing Dixon presented a challenging decision that left him unable to take any action or make any decision. The prospect of the sexual assault and harassment becoming public and dealing with Perry's highly paid attorneys was daunting. Perry had significant resources, whereas Dixon did not. Dixon's goals of working as an actor and being discovered for his talents might be jeopardized.

158.    In what was an extremely difficult decision, Dixon bowed to the pressure and fear of losing his livelihood, and in hopes of advancing his career, Dixon decided to return to the set and have his Pilot produced. He insisted, however, and decided to put safeguards in place between himself and Perry.

159.    In or around November 2021, Dixon returned to shoot "The Oval." It was then when he

COMPLAINT

LAW OFFICES OF JONATHAN J. DELSHAD, PC

saw Perry for the first time in person since the June 2021 sexual assault. Dixon suffered a panic attack in his trailer, prompting another actor to calm Dixon down.

160.    Seeing that Dixon was still upset, Perry knew that he had to 'up the ante' to ensure Dixon's silence. Perry began periodically texting Plaintiff regarding the production of the pilot of "Losing It" to string Dixon along.

161.    Soon after, Dixon received a call from a member of Perry's production team telling him that they were considering shooting Dixon's Pilot in the coming fall of 2021. Dixon was desperate for this good news given the uncertainty surrounding his finances and concern about his future.

162.    On or around March 4, 2022, Dixon signed the literary purchase agreement for the Pilot, giving the rights for the series to Defendant TPS. Dixon was unaware of TPS's pre-existing television contracts with ViacomCBS, now known as "Paramount Global," which would later prevent the sale of Dixon's show to any media outlets or streaming services for two years.

163.    On or around March 21, 2022, shortly after seeing each other on the set of "The Oval," Dixon and Perry began shooting the Pilot. Perry called Dixon following the shoot, telling him that the show would net $2-3 million per episode and run for two seasons, "guaranteed."

164.    Perry purchased the rights to "Losing It" from Dixon but did not try to sell it to any network. In fact, Perry was under contract with ViacomCBS **preventing him** from selling Dixon's show for an additional two years following the purchase. In other words, Perry spent money shooting a pilot for a show and then purchasing the rights to it, knowing that Perry could not sell the show for two years. Clearly this was done for the ulterior motive of silencing Mr. Dixon.

165.    As it turns out, Perry had no intention of ever producing "Losing It." Perry never made any effort to sell the show or shop it. Perry was only using the show as a quid pro quo to Dixon, holding its production over Dixon's head like the sword of Damocles.

166.    On or around April 9, 2022, to his surprise, Plaintiff received the script for another season of "The Oval," in which Plaintiff's character, originally written as a grocery store clerk, would play a male prostitute being pursued by a pimp. This character's scenes and story shared eerie similarities to Perry's pursuit of Dixon.

167.    While it was not surprising that one of Perry's characters would end up this way, the timing

LAW OFFICES OF JONATHAN J. DELSHAD, PC

LAW OFFICES OF JONATHAN J. DELSHAD, PC

of change to Dixon was a very clear message. As Dixon continued to read through his scripts, he started to notice that Perry included lines taken directly from things that Perry and Dixon spoke about. Perry started to base the script on real life and made it personal. For example, Perry wrote about Dixon that "I don't like none of my bitches running away. He was making good money for me."

168.    In or around April 2022, before beginning to shoot the next season of the Oval, Perry called Dixon to discuss the June 2021 sexual assault. On the phone call, Perry lectured Dixon about how Dixon was overreacting to the sexual assault because of prior sexual assaults in Dixon's life. Perry said that there was a "misunderstanding and miscommunication," and that Dixon "needed to say 'no' stronger." In other words, Perry blamed Dixon for the sexual assault, claiming that Perry felt that Dixon's "No" was really a "Yes" because Dixon did not say "No" strongly enough.

169.    So as not to jeopardize his employment with Defendants Perry and TPS, Dixon dismissed the conversation, especially due to the allegedly impending sale of his show to a major broadcasting company.

170.    On or around October 28, 2022, after filming a full season of "The Oval," Perry told Dixon that despite shooting the Pilot, it could "take a while to place," and that Perry couldn't do any other television series until "[his] deal was up with Viacom" which would take about two years.

171.    In or around January of 2023, Plaintiff indicated that he was moving to Santa Monica. He did so to put some distance between himself and Perry. Tyler Perry replied that he was glad to hear that Dixon was moving away and asked if Dixon's "no" was stronger before he left. Perry reiterated that Dixons should have a "strong no," and "make it clear," when



1    he said "No."

2    172.    This was Perry's way of once again referring to his June 2021 sexual assault of Dixon and

3    making it clear that Perry felt no remorse for assaulting Dixon against Dixon's will.

4    173.    Dixon remained calm considering these triggering comments, because he needed Perry to

5    help him with his dreams of producing a show, and because Dixon was still a regular actor on "The

6    Oval."

7    174.    Even after Dixon moved to California, the quid pro quo harassment and attempts to cover

8    up the sexual assault by promising a show continued.

9    175.    Perry would call Dixon, who felt obligated to pick up Perry's phone calls and respond to

10   text messages. These conversations would often start about work and the men's business

11   relationship and then transition to further conversations about Dixon's sex life, adding to Dixon's

12   trauma and forcing him to relive the sexual assault. Perry continued to envelop Dixon in this

13   feeling of reliance and justify the sexual assault that happened.

14   176.    Perry would call Dixon and say, "you'll understand when you have a hit show" and in the

15   same breath refer to the sexual assault by saying "I'm so glad we're past that." Dixon knew that

16   he had to just hold his tongue because Perry was still employing Dixon.

17   177.    On or around October 2023, Tyler Perry finally contacted Dixon, indicating that he was

18   going to be finished with his Paramount Global contract in January 2024 and that he would be able

19   to start working on selling "Losing It." Perry was just hoping that the statute of limitations would

20   run on Dixon's sexual assault claims before closing the door on Dixon's hope and on the quid pro

21   quo that Perry offered for Dixon's silence.

22   178.    In the same conversation where they are talking about Perry starting to do things with

23   "Losing It," Tyler Perry also asked Dixon who he was having sex with. Perry further pushed for

24   details asking Dixon if he was the "giver or the receiver in this scenario," or if Plaintiff used

25   protection and prep when engaging in sexual acts. Perry continued to probe other intimate details

26   about Dixon's sex life.

27   179.    Perry again told Dixon that Perry wants a partner with whom he could have an emotional

28   and sexual relationship, but who goes back to their partner at the end of the day.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

180.     In December 2023, Christian Keyes, another actor who worked for Perry prior to Dixon's employment, posted a video on social media platforms detailing his abusive experience with an anonymous "black Hollywood billionaire," which Dixon pieced together and believes to be Tyler Perry.     See     https://atlantablackstar.com/2023/12/16/christian-keyes-alleges-sexual-harassed-black-hollywood-director/

181.     Dixon heard Mr. Keyes' account and saw that Perry had been engaging in the same sexual conduct as other actors. Just like the interactions described by Keyes, Perry would get drunk, climb into Dixon's bed and start fondling Dixon's buttocks. Dixon wanted to share his experiences with the media to prevent other actors from being abused at the hands of Perry.

182.     Around this time Perry called Dixon, indicating that he really "wanted to find a home" for Dixon's television series, again perpetuating the quid pro quo after the sexual assault to keep Dixon and his claims at bay.

183.     Then, in January of 2024, Perry told Dixon to begin working on a pitch deck for investors for the Pilot. Despite having eight episodes written, Perry only produced one, claiming that the president of his company, Michelle Sneed, conveniently misplaced the million dollars that were going to be used for the show. During this time, Perry further solicited Dixon's assistance with other films and projects that Tyler Perry was working on. Once again, Dixon was in a position where he could not say no.

184.     In or around March of 2024, Tyler Perry indicated to Derek Dixon that the individual who was meant to pitch the Pilot became depressed and could no longer pitch the show. This was another excuse for the fact that Perry never liked the show and never intended to sell it.



LAW OFFICES OF JONATHAN J. DELSHAD, PC

185.    Dixon did not get angry and allowed Perry more time to figure things out for the show. Mistakenly sensing that Dixon had forgiven him, Perry started back up with the harassment. Perry continued to harass Dixon, who was still working on "The Oval" and who was still waiting eagerly for Perry to sell "Losing It." Perry would tell Dixon that he "loved [Dixon]," that Dixon should be "living [his] life," and that Dixon should be "having sex more." Perry even indicated that he would send Dixon's show to Peter Friedlander at Netflix. But all this was just an attempt to remind Dixon of the sword of Damocles hanging over his neck.

186.    Later, Perry told Dixon that Netflix turned the show down. Dixon was never contacted by any individuals from Netflix regarding the show, and no sale ever materialized.

187.    In or around June of 2024, Perry, sensing that Dixon was getting frustrated about his show not getting off ground and still concerned about the sexual assault being made public, offered Dixon a position as a writer on Perry's shows, indicating that he needed a replacement to continue writing.

188.    It was only then that Dixon woke up and realized that Perry was never going to be serious about helping Dixon. Perry was only going to do things for Dixon if Dixon played along with the sexual harassment and assault. Perry was only interested in preventing Dixon from exposing the dark side of Tyler Perry. Perry only cared that people still view him as the victim he once was, even now as he took shape as the victimizer.  Dixon became sick to his stomach.

189.    Rather than continue down this path. Dixon took the heroic step of reporting the sexual harassment to the EEOC.

190.    After reporting the sexual harassment, Defendants did not make any investigation into the complaint and did not take any steps to prevent further harassment from occurring.

191.    Because Defendants took no action to prevent further assault or harassment, Dixon had to quit his job working on the last season of "The Oval." Dixon did so even though he was under contract to finish filming and stood to make close to $400,000. Dixon did not want to be sexually harassed or be placed in danger of a sexual assault again.

192.    Defendant then retaliated against Dixon.

193.    Defendant told Dixon that if he quit and told the other actors why he quit, he would be in

LAW OFFICES OF JONATHAN J. DELSHAD, PC

breach of his contract. Defendants told Dixon that the only way out was to portray his departure from the show as a medical leave due to the emotional distress caused by the sexual harassment.

194.    The leave of absence was to be paid medical leave.

195.    Instead, Defendant made the leave of absence unpaid and therefore terminated Plaintiff's employment causing Dixon additional loss of income and insult.

## **FIRST CAUSE OF ACTION**

### **QUID PRO QUO SEXUAL HARRASSMENT**

### **Gov. Code 12940(j)**

### *(Against all Defendants)*

196.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

197.    At relevant times, Mr. Dixon was an employee of TPS and Mr. Perry was responsible for the hiring and firing of Mr. Dixon as defined in California.

198.    Alternatively, Mr. Dixon was an actor on the set of a show that Mr. Perry was producing for TPS and was therefore providing services to TPS and Mr. Perry and they were involved in a business relationship which is subject to Gov. Code 12940(j).

199.    Tyler Perry made unwanted sexual advances to Mr. Dixon.

200.    Tyler Perry also made unwanted verbal and physical conduct of a sexual nature.

201.    The terms of employment, job benefits, opportunities for continued work, additional pay, and other favorable working conditions were made contingent (by words and/or conduct) on Mr. Dixon's acceptance of Tyler Perry's sexual advances or conduct.

202.    Mr. Perry made it clear to Mr. Dixon that he would kill off Mr. Dixon's character if he did not indulge Mr. Perry's sexual harassment.

203.    After Mr. Perry made his move and sexually assaulted Mr. Dixon, Perry offered Dixon the opportunity to make a show if he remained silent about the assault, furthering the quid pro quo arrangement.

204.    Eventually Mr. Dixon could not continue working given the continued quid pro quo

LAW OFFICES OF JONATHAN J. DELSHAD, PC

harassment. The work conditions were such that Mr. Dixon was constructively terminated.

205.    At all relevant times, Mr. Perry was a supervisor or agent as defined in California law with the ability to affect the terms of Mr. Dixon's employment / work contract.

206.    As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment, humiliation, injury to his professional reputation, mental anguish, emotional distress and post-traumatic stress disorder in an amount to be proven at trial. Plaintiff is further entitled to recover reasonable attorney's fees, costs, and pre-judgment interest in connection with this matter.

207.    Defendants committed the acts herein alleged maliciously and fraudulently, with the wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of malice, in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were carried out by managerial employees acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants.

## SECOND CAUSE OF ACTION

### WORK ENVIROMENT HARRASSMENT

### Gov. Code 12940(j)

### *(Against all Defendants)*

208.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

209.    At relevant times, Mr. Dixon was an employee of TPS and Mr. Perry was responsible for the hiring and firing of Mr. Dixon as defined in California.

210.    Alternatively, Mr. Dixon was an actor on the set of a show that Mr. Perry was producing for TPS and was therefore providing services to TPS and Mr. Perry.

211.    Tyler Perry made severe unwanted sexual advances and made unwanted verbal and physical conduct of a sexual nature toward Mr. Dixon which caused the work environment to be hostile, intimidating, offensive, oppressive or abusive.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

212.    A reasonable person in Mr. Dixon's circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive or abusive.

213.    Mr. Dixon's circumstances considered the work environment to be hostile, intimidating, offensive, oppressive or abusive and as a result was constructively terminated.

214.    Mr. Dixon had no other avenue to prevent sexual harassment given that all HR functions and company functions reported ultimately to Mr. Perry.

215.    At all relevant times, Mr. Perry was a supervisor or agent as defined in California law with the ability to affect the terms of Mr. Dixon's employment / work contract.

216.    The terms of employment, job benefits, opportunities for continued work, additional pay, and other favorable working conditions were made contingent (by words and/or conduct) on Mr. Dixon's acceptance of Tyler Perry's sexual advances or conduct.

217.    Mr. Perry made it clear to Mr. Dixon that he would kill off Mr. Dixon's character if he did not indulge Mr. Perry's sexual harassment.

218.    As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment, humiliation, injury to her professional reputation, mental anguish, emotional distress and post-traumatic stress disorder in an amount to be proven at trial. Plaintiff is further entitled to recover reasonable attorney fees, costs, and pre-judgment interest in connection with this matter.

219.    Defendants committed the acts herein alleged maliciously and fraudulently, with the wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of malice, in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were carried out by managerial employees acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants.

//

//

//

//

LAW OFFICES OF JONATHAN J. DELSHAD, PC

### THIRD CAUSE OF ACTION

### CALIFORNIA CIVIL CODE §51.9

### SEXUAL HARRASSMENT IN DEFINED RELATIONSHIP – RALPH ACT

### *(Against Defendant Perry, AA and TPS)*

220.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

221.    Mr. Dixon had a business / professional relationship with Mr. Perry and TPS. Mr. Dixon was an actor on shows for Mr. Perry and TPS and entered into a contract to produce a pilot for a show called "Losing It" and to shop and sell the show.

222.    Additionally, TPS and Perry held themselves out as being able to help Mr. Dixon establish a business relationship with movie studios or other film production companies.

223.    Tyler Perry, the owner of TPS made sexual advances, solicitations, sexual requests, and demands for sexual compliance to Mr. Dixon.

224.    Defendants Tyler Perry and TPS through Perry also engaged in other verbal, visual, or physical conduct of a sexual nature.

225.    Defendants Tyler Perry's conduct and TPS's conduct through Perry, were unwelcome and pervasive or severe.

226.    Defendants intentionally, recklessly, and wantonly acts resulted in harmful and offensive contact with the intimate parts of Plaintiff's person.

227.    Defendant Perry used his authority to coerce and exploit Plaintiff to spend time with him on several occasions so that Defendant Perry could physically, psychologically, and/or emotionally through force, manipulation, emotional abuse, intimidation, and retaliation abuse Plaintiff. These acts were done for Defendant Perry's sexual gratification.

228.    As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment, humiliation, injury to her professional reputation, mental anguish, emotional distress and post-traumatic stress disorder in an amount to be proven at trial. Plaintiff is further entitled to recover

LAW OFFICES OF JONATHAN J. DELSHAD, PC

1   reasonable attorney's fees, costs, and pre-judgment interest in connection with this matter.

2   229.    Defendants committed the acts herein alleged maliciously and fraudulently, with the

3   wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of

4   malice, in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were

5   carried out by managerial employees acting in a despicable, deliberate, cold, callous, and

6   intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive

7   damages from Defendants.

8                                   **FOURTH CAUSE OF ACTION**

9   **WORKPLACE GENDER VIOLENCE IN VIOLATION OF CAL CIV. CODE § 52.4**

10                                  **(Against all Defendants)**

11  230.    Plaintiff incorporates by reference and realleges herein each and every one of the

12  allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set

13  forth herein.

14  231.    As alleged herein, Defendants are strictly liable for Perry's actions under the principles of

15  respondent superior, as alleged herein and otherwise had advance knowledge that Defendant

16  Perry's would engage in this despicable conduct, and by their actions and inactions ratified,

17  authorized and condoned this unlawful behavior.

18  232.    California Civil Code Section 52.4 provides: "(a) Any person who has been subjected to

19  gender violence may bring a civil action for damages against any responsible party. The plaintiff

20  may seek actual damages, compensatory damages, punitive damages, injunctive relief, any

21  combination of those, or any other appropriate relief. A prevailing plaintiff may also be awarded

22  attorney's fees and costs. . . (c) For purposes of this section, "gender violence," is a form of sex

23  discrimination and means any of the following: (1) One or more acts that would constitute a

24  criminal offense under state law that has as an element the use, attempted use, or threatened use of

25  physical force against the person or property of another, committed at least in part based on the

26  gender of the victim, whether or not those acts have resulted in criminal complaints, charges,

27  prosecution, or conviction. (2) A physical intrusion or physical invasion of a sexual nature under

28  coercive conditions, whether or not those acts have resulted in criminal complaints, charges,

LAW OFFICES OF JONATHAN J. DELSHAD, PC

LAW OFFICES OF JONATHAN J. DELSHAD, PC

prosecution, or conviction."

233.    As alleged herein, Perry violated California Civil Code Section 52.4 in that he engaged in a physical intrusion or physical invasion of a sexual nature under coercive conditions, even if those acts have not yet resulted in criminal complaints, charges, prosecution, or conviction.

234.    As a direct and proximate result of Defendants' violation of California Civil Code Section 52.4, Plaintiff suffered physical sickness, physical injuries, body pains, post-traumatic stress disorder, humiliation, embarrassment, mental and severe emotional distress and anxiety, all in an amount according to proof at trial.

235.    The acts of Defendants, as alleged herein, were willful, wanton, and malicious and were intended to oppress and cause injury to Plaintiff. In light of the willful, wanton, malicious and intentional conduct engaged in by Defendants, Plaintiff is entitled to an award of punitive damages.

236.    Plaintiff has incurred, and will continue to incur, attorneys' fees in the prosecution of this action and therefore demand reasonable attorneys' fees and costs as set by the court.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE BANE ACT IN VIOLATION OF CAL CIV. CODE § 52.1

### (Against all Defendants)

237.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

238.    Civil Code section 52.1, the Bane Act, provides that it is unlawful to interfere with the exercise or enjoyment of any rights under the Constitution and laws of this state and the United States by use or attempted use of threats, intimidation or coercion.

239.    At all times herein mentioned, there was a professional relationship between Plaintiff and Defendants, as set forth above.

240.    As alleged herein, Defendants engaged in severe and outrageous sexual harassment and sexual assaults against Plaintiff. Defendants' acts were calculated to prevent Plaintiff from working free of sexual harassment or violence, and Defendants' acts were further calculated to prevent Plaintiff from reporting Defendants' unlawful conduct.

241.    Plaintiff's sex was the substantial motivating reason for Defendants' unwanted physical contact and ultimate sexual harassment and sexual assaults.

242.    Plaintiff is informed and believed and thereon alleges that the aforementioned conduct of Defendants, and each of them, denied, aided, or incited in a denial of, discriminated or made a distinction that denied plaintiff full and equal advantages, privileges, and services to Plaintiff, based solely upon Plaintiff's refusal to submit to continued sexual advances and her objections to the physical harassment that was inflicted upon her, and therefore constituted a violation of the Bane Act.

243.    As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment, humiliation, injury to his professional reputation, mental anguish, emotional distress and post-traumatic stress disorder in an amount to be proven at trial. Plaintiff is further entitled to recover reasonable attorney's fees, costs, and pre-judgment interest in connection with this matter.

244.    Defendants committed the acts herein alleged maliciously and fraudulently, with the wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of malice, in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were carried out by managerial employees acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants.

## SIXTH CAUSE OF ACTION

### CIVIL CODE §1708.5 – SEXUAL BATTERY

### *(Against Defendant Perry)*

245.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

246.    Defendant Tyler Perry intended to cause harmful or offensive contact with Mr. Dixon's buttocks and other sexual areas on multiple occasions, and a sexually offensive contact with Mr. Dixon resulted.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

247. Mr. Dixon did not consent to the offensive contact.

248. Mr. Dixon was harmed and offended by Mr. Perry's conduct.

249. As a result of Tyler Perry's conduct, Mr. Dixon was damaged in the amount set forth below.

250. As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment, humiliation, injury to his professional reputation, mental anguish, emotional distress and post-traumatic stress disorder in an amount to be proven at trial. Plaintiff is further entitled to recover reasonable attorney's fees, costs, and pre-judgment interest in connection with this matter.

251. Defendants committed the acts herein alleged maliciously and fraudulently, with the wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of malice, in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were carried out by managerial employees acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants.

## SEVENTH CAUSE OF ACTION

### SEXUAL ASSAULT

### *(Against Defendant Tyler Perry)*

252. Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

253. That Tyler Perry acted intending to cause harmful or offensive conduct.

254. That Mr. Dixon reasonably believed that he was about to be touched in a harmful or offensive manner.

255. That Mr. Dixon did not consent to Tyler Perry's conduct.

256. Mr. Dixon was harmed by Mr. Perry's conduct.

257. Tyler Perry's conduct was a substantial factor in causing Mr. Dixon's harm.

258. As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment,

LAW OFFICES OF JONATHAN J. DELSHAD, PC

humiliation, injury to his professional reputation, mental anguish, emotional distress and post-traumatic stress disorder in an amount to be proven at trial. Plaintiff is further entitled to recover reasonable attorney's fees, costs, and pre-judgment interest in connection with this matter.

259.    Defendants committed the acts herein alleged maliciously and fraudulently, with the wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of malice, in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were carried out by managerial employees acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants.

### EIGHTH CAUSE OF ACTION

### NEGLIGENT HIRING, SUPERVISION, OR RETENTION OF AN EMPLOYEE

### (Against Defendant *TPS*)

260.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

261.    As alleged herein, Defendants, and each of them, and/or their managerial employees or agents knew or reasonably should have known that employees of Defendants were engaging in the unlawful harassing and discriminatory conduct alleged herein.

262.    Defendants, and each of them, knew or should have known that their employees, including but not limited to Tyler Perry, had a history of engaging in unlawful or dangerous conduct that could cause injury to Plaintiff and others, yet failed to take any action to prevent such injury.

263.    In fact, it is alleged that Christian Keyes and others may have been subjected to the same sexual harassment and TPS knowingly covered up the harassment to protect Mr. Perry.

264.    TPS allegedly took actions against Mr. Keyes, including but not limited to paying Mr. Keyes a certain sum of money and threating him if he disclosed Perry's sexual harassment.

265.    At all relevant times, Defendants, and each of them, and/or their managerial employees or agents knew or reasonably should have known that the conduct and omissions alleged herein violated Plaintiff's rights under state statutes and common law.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

266.    At all relevant times, Defendants, and each of them, and/or their managerial employees or agents knew or reasonably should have known that the conduct alleged herein would and did proximately result in physical injury and emotional distress to Plaintiff.

267.    At all relevant times, Defendants, and each of them, and/or their managerial employees or agents knew or reasonably should have known that unless they intervened to protect Plaintiff, and adequately supervise, prohibit, control, regulate, discipline and/or other penalize the conduct of Defendants' employees as alleged herein, other Defendants and Defendants' employees perceived the conduct and omissions as being ratified and condoned.

268.    At all relevant times, the negligent failure of Defendants to protect Plaintiff, and to supervise, prohibit, control, regulate, discipline, and/or otherwise penalize adequately the conduct and omissions of Defendants' employees violated Plaintiff's rights under state statutes and common law and was a substantial factor in causing Plaintiff's harm, as alleged herein.

## NINTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (Against all Defendants)

269.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

270.    Defendant conspired to and did engage in conduct that was extreme and outrageous and intentionally caused severe emotional distress to Plaintiff.

271.    Defendants' conduct exceeded all possible bounds of decency.

272.    Defendant acted with the intent and knowledge that Plaintiff suffered emotional distress due to their inexcusable and outrageous conduct.

273.    Defendant's conduct caused Plaintiff to suffer severe mental and emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life.

274.    Defendant's unlawful actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights.

275.    Plaintiff claims compensatory and punitive damages herein.

LAW OFFICES OF JONATHAN J. DELSHAD, PC

276.    The amount of damages sought herein exceeds the jurisdictional limits of all other Courts which would otherwise have jurisdiction.

## TENTH CAUSE OF ACTION

### RETALIATION (FEHA)

### *(Against all Defendants)*

277.    Plaintiff incorporates by reference and realleges herein each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

278.    Before the taping of season seven of "The Oval" Derek Dixon made a formal complaint about the sexual harassment he was experiencing from Tyler Perry to Defendants through his attorney.

279.    That complaint was protected activity.

280.    After reporting the sexual harassment, Defendants did not make any investigation into the complaint and did not take any steps to prevent further harassment from occurring.

281.    Instead, Defendant told Plaintiff that he should take a medical leave of absence from the show due to the emotional distress caused by the sexual harassment and not report to any of his coworkers the real reasons for his absence.

282.    Plaintiff was expecting the leave of absence to be paid medical leave.

283.    Instead, Defendant made the leave of absence unpaid and therefore terminated Plaintiff's employment.

284.    Plaintiff stood to make around $400,000 for his role in season 7 of "The Oval."

285.    At all relevant times, Defendants, and each of them, and/or their managerial employees or agents knew or reasonably should have known that the conduct alleged herein would and did proximately result in physical injury and emotional distress to Plaintiff.

286.    At all relevant times, Defendants, and each of them, and/or their managerial employees or agents knew or reasonably should have known that unless they intervened to protect Plaintiff, and adequately supervise, prohibit, control, regulate, discipline and/or other penalize the conduct of Defendants' employees as alleged herein, other Defendants and Defendants' employees perceived

LAW OFFICES OF JONATHAN J. DELSHAD, PC

LAW OFFICES OF JONATHAN J. DELSHAD, PC

1  the conduct and omissions as being ratified and condoned.

2  287.    At all relevant times, the negligent failure of Defendants to protect Plaintiff, and to

3  supervise, prohibit, control, regulate, discipline, and/or otherwise penalize adequately the conduct

4  and omissions of Defendants' employees violated Plaintiff's rights under state statutes and

5  common law and was a substantial factor in causing Plaintiff's harm, as alleged herein.

6  **PRAYER FOR RELIEF**

7        Plaintiff prays for judgment as follows:

8  1.    For special, general, punitive, and compensatory damages according to proof at trial.

9  2.    For reasonable attorneys' fees, expert witness fees, and other litigation expenses pursuant

10  to law.

11  3.    For injunctive relief where the court deems appropriate.

12  4.    For all other relief the Court deems appropriate and just:

13  5.    For a total amount of damage, including punitive damages of $260,000,000.00

14

15  Respectfully submitted,

16  Dated: June 13, 2025

17

18

19  By: _____

20

21  Jonathan J. Delshad, Esq.
   **LAW OFFICES OF JONATHAN J. DELSHAD, PC**
22  www.delshadlegal.com

23  Attorney for Plaintiff
24  DEREK DIXON

25

26

27

28



*Superior Court of California, County of Los Angeles*
**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at* [www.lacourt.org/ADR/programs.html](www.lacourt.org/ADR/programs.html).
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at* [www.lacourt.org/ADR](www.lacourt.org/ADR) *or email* [ADRCivil@lacourt.org](ADRCivil@lacourt.org).

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at* [ADRCivil@lacourt.org](ADRCivil@lacourt.org).

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit* [https://resolvelawla.com](https://resolvelawla.com).

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/13/2025 3:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

| SHORT TITLE | CASE NUMBER |
|---|---|
| Dixon v. Tyler Perry et. al. | 25STCV17235 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> **This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Dixon v. Tyler Perry et. al. | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☑ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☑ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

| SHORT TITLE | CASE NUMBER |
|---|---|
| Dixon v. Tyler Perry et. al. | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

LASC CIV 109 Rev. 01/23

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Dixon v. Tyler Perry et. al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE<br>Dixon v. Tyler Perry et. al. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>111 N. Hill St. |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90012 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the <u>Central</u> District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: <u>06/13/2025</u>

_____
(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Law Offices of Jonathan J. Delshad<br>Jonathan J. Delshad (SBN 246176)<br>1663 Sawtelle Blvd, Suite 220<br>Los Angeles, CA 90025<br>TELEPHONE NO.: 424-255-8376    FAX NO.: 424-256-7899<br>ATTORNEY FOR *(Name):* Derek Dixon | **Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>6/13/2025 3:25 PM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By E. Galicia, Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS: 111 N. Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Dixon v. Tyler Perry, et. al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ **Counter**  ☐ **Joinder**<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 25STCV17235 |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse condemnation (14) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | ☐ Enforcement of judgment (20) |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | **Miscellaneous Civil Complaint** |
| ☐ Civil rights (08) | **Unlawful Detainer** | ☐ RICO (27) |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Fraud (16) | ☐ Residential (32) | **Miscellaneous Civil Petition** |
| ☐ Intellectual property (19) | ☐ Drugs (38) | ☐ Partnership and corporate governance (21) |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Other petition *(not specified above)* (43) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☑ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary    b. ☑ nonmonetary; declaratory or injunctive relief    c. ☑ punitive
4. Number of causes of action *(specify):* 10
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 13, 2025

Jonathan J. Delshad
_____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |
|---|---|---|
| | | American LegalNet, Inc.<br>www.FormsWorkflow.com |

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>06/13/2025<br><br>David W. Slayton, Executive Officer / Clerk of Court<br><br>By: _____ E. Galicia _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>25STCV17235 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Theresa M. Traber | 47 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 06/16/2025
(Date)

David W. Slayton, Executive Officer / Clerk of Court

By E. Galicia_____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

### NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
 TYLER PERRY, an individual; TPS PRODUCTION SERVICES, LLC, a Limited Liability
 Company; AND ACTION LLC, a Limited Liability Company and DOES 1-50, Inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
 DEREK DIXON, an individual

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/13/2025 3:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

   Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

   Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Stanley Mosk Courthouse
111. N Hill Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
25STCV17235

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
 Law Offices of Jonathan J. Delshad, 1660 S Sawtelle Blvd, Ste 280, Los Angeles, CA 90025, (424) 255-8376

DATE:  June 13, 2025
*(Fecha)*  06/13/2025

Clerk, by
*(Secretario)*  E. Galicia

, Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

PLAINTIFF:
Derek Dixon

DEFENDANT:
Tyler Perry, et al.

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

06/18/2025

David W. Slayton, Executive Officer / Clerk of Court

By: _____ M. Soto _____ Deputy

## NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER:
25STCV17235

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| | | |
|---|---|---|
| Date: 10/15/2025 | Time: 8:30 AM | Dept.: 47 |

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: 06/18/2025

_____
Judicial Officer
Theresa M. Traber / Judge

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in Los Angeles_____, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Jonathan J. Delshad.
1663 Sawtelle Blvd.
Suite 220
Los Angeles, CA 90025

Dated: 06/18/2025

David W. Slayton, Executive Officer / Clerk of Court

By M. Soto_____
Deputy Clerk

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter 7KUHH

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS: Stanley Mosk Courthouse
111 North Hill Street Los Angeles, CA 90012

PLAINTIFF(S):   Derek Dixon

DEFENDANT(S): Tyler Perry, et al.

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

08/05/2025

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Alba _____ Deputy

## NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE (Dates Remain)

CASE NUMBER:
25STCV17235

TO THE PLAINTIFF(S) AND PLAINTIFF'S ATTORNEY OF RECORD:

You are notified that effective <u>08/11/2025</u>, an order was made that the above entitled action, previously assigned to Judge <u>Theresa M. Traber</u> is now and shall be assigned to Judge <u>Nicholas F. Daum</u>, as an Individual Calendar (IC), direct calendaring judge for all purposes, including trial, in Department <u>47</u> at <u>Stanley Mosk Courthouse</u> (See Chapter 3, Los Angeles Court Rules). All matters  on calendar in this case will remain set on the dates previously noticed, in the department indicated above unless otherwise ordered by the court.

Notice is further given that plaintiff in propria persona or counsel for the plaintiff is ordered to give notice of this all-purpose case assignment by serving a copy of the notice on all parties to this action within 10 days of service of this notice by the court, and file proof of service thereof within 12 days of this notice.  Failure to timely give notice and file proof of service may lead to imposition of sanctions pursuant to Code of Civil Procedure section 177.5 or otherwise.

David W. Slayton, Executive Officer / Clerk of Court

Dated: 08/05/2025

By A. Alba _____
                        Deputy Clerk

**NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE**
**(Dates Remain)**

LASC CIV 304 NEW 05/24
For Optional Use

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

FOR COURT USE ONLY

COURTHOUSE ADDRESS:

Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

PLAINTIFF(S)/PETITIONER(S):

Derek Dixon

DEFENDANT(S)/RESPONDENT(S):

Tyler Perry, et al.

**FILED**
Superior Court of California
County of Los Angeles

08/05/2025

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Alba _____ Deputy

## CLERK'S CERTIFICATE OF SERVICE
## BY ELECTRONIC SERVICE

CASE NUMBER:

25STCV17235

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Notice of Case Reassignment and Order for Plaintiff to Give Notice of 08/05/2025**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Delshad, Jonathan J." <jdelshad@delshadlegal.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Stanley Mosk Courthouse, 111 North Hill Street in Los Angeles, California.

Dated: 08/5/2025

David W. Slayton, Executive Officer / Clerk of Court

By:  A. Alba _____
                        Deputy Clerk

**Page 1 of 1**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>Jonathan        Delshad (SBN 246176)<br>Law Offices of Jonathan J. Delshad, PC<br>1663 Sawtelle Blvd #220  Los Angeles, CA 90025<br><br>TELEPHONE NO.: (424) 255-8376 \| FAX NO.  \| E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiff: DEREK DIXON | *FOR COURT USE ONLY*<br><br>**Electronically FILED by**<br>**Superior Court of California,**<br>**County of Los Angeles**<br>**8/25/2025 9:55 PM**<br>David W. Slayton,<br>**Executive Officer/Clerk of Court,**<br>**By M. Saxon, Deputy Clerk** |

| | |
|---|---|
| **LOS ANGELES SUPERIOR COURT**<br><br>STREET ADDRESS: 111 NORTH HILL STREET<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: LOS ANGELES, CA 90012<br>BRANCH NAME: STANLEY MOSK COURTHOUSE, CENTRAL DISTRICT | |
| PLAINTIFF:  DEREK DIXON | CASE NUMBER:<br><br>25STCV17235 |
| DEFENDANT: TYLER PERRY, et al. | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>DEREK DIXON |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:

   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ Cross-complaint
   f. ☑ other *(specify documents):* **NOTICE OF CASE ASSIGNMENT; NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE (Dates Remain); NOTICE OF CASE MANAGEMENT CONFERENCE**

3. a. Party served *(specify name of party as shown on documents served):*
   **TYLER PERRY, an individual**

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:  **3300 Shoals School Rd**
   **Douglasville, GA 30135-2935**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **8/25/2025**    (2) at *(time):* **2:29 PM**
   **Age: 55 Weight: 250 Hair: COVERED Sex: Male Height: 6'5 Eyes:  Race: AFRICAN AMERICAN**

   b. ☐ **by substituted service.** On *(date):*  at  *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
   *(date):*  from *(city):*                                        **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| | | |
|---|---|---|
| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/1942978** |

| | |
|---|---|
| PETITIONER: **DEREK DIXON** | CASE NUMBER: |
| RESPONDENT: **TYLER PERRY, et al.** | **25STCV17235** |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                        (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☑ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☐ On behalf of:
    under the following Code of Civil Procedure section:

    ☐ 416.10 (corporation)              ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)        ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)              ☐ 415.46 (occupant)
                                    ☐ other:

7. **Person who served papers**
a. Name: **Eric West - Steno Agency, Inc.**
b. Address: **315 West 9th Street  Los Angeles, CA 90015**
c. Telephone number: **(213) 516-4166**
d. **The fee** for service was: **$**
e. I am:

    (1) ☑ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☐ registered California process server:
        (i) ☐ owner      ☐ employee    ☐ independent contractor.
        (ii) Registration No.:
        (iii) County:

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **8/25/2025**

**Steno Agency, Inc.**
**315 West 9th Street**
**Los Angeles, CA 90015**
**(213) 516-4166**
**www.steno.com**

_____
              **Eric West**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)                 (SIGNATURE)

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Jonathan    Delshad (SBN 246176)<br>Law Offices of Jonathan J. Delshad, PC<br>1663 Sawtelle Blvd #220  Los Angeles, CA 90025 | |

TELEPHONE NO.: (424) 255-8376 | FAX NO. | E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name):* Plaintiff: DEREK DIXON

**LOS ANGELES SUPERIOR COURT**

STREET ADDRESS: 111 NORTH HILL STREET

MAILING ADDRESS:

CITY AND ZIP CODE: LOS ANGELES, CA 90012

BRANCH NAME: STANLEY MOSK COURTHOUSE, CENTRAL DISTRICT

**Electronically FILED by
Superior Court of California,
County of Los Angeles
8/29/2025 6:24 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By A. Simmons, Deputy Clerk**

PLAINTIFF: DEREK DIXON

DEFENDANT: TYLER PERRY, et al.

CASE NUMBER:

25STCV17235

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |
|---|---|
| | DEREK DIXON |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ Cross-complaint
   f. ☑ other *(specify documents):* **NOTICE OF CASE ASSIGNMENT; NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE (Dates Remain); LETTER DATED AUGUST 21, 2025; NOTICE OF CASE MANAGEMENT CONFERENCE**

3. a. Party served *(specify name of party as shown on documents served):*
   **TPS PRODUCTION SERVICES, LLC, a Limited Liability Company**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **JANE RICHARDSON AUTHORIZED TO ACCEPT ON BEHALF OF CT CORPORATION SYSTEM - REGISTERED AGENT**

4. Address where the party was served: **289 S Culver St
   Lawrenceville, GA 30046-4805**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 8/27/2025   (2) at *(time):* **11:04 AM**
   **Age: 67 Weight: 200 Hair: DARK BLONDE Sex: Female Height: 5'9 Eyes: GLASSES Race: CAUCASIAN**

   b. ☐ **by substituted service.** On *(date):*   at *(time):*   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*   from *(city):*                    **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/1942571** |
|---|---|---|

| PETITIONER: DEREK DIXON | CASE NUMBER: |
|---|---|
| RESPONDENT: TYLER PERRY, et al. | 25STCV17235 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                            (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

    a. ☐ as an individual defendant.
    b. ☐ as the person sued under the fictitious name of *(specify):*
    c. ☐ as occupant.
    d. ☑ On behalf of: **TPS PRODUCTION SERVICES, LLC, a Limited Liability Company**
        under the following Code of Civil Procedure section:

        ☐ 416.10 (corporation)                ☐ 415.95 (business organization, form unknown)
        ☐ 416.20 (defunct corporation)         ☐ 416.60 (minor)
        ☐ 416.30 (joint stock company/association)   ☐ 416.70 (ward or conservatee)
        ☑ 416.40 (association or partnership)      ☐ 416.90 (authorized person)
        ☐ 416.50 (public entity)             ☐ 415.46 (occupant)
                                        ☐ other:

7. **Person who served papers**
    a. Name: **Kimberly Greenway - Steno Agency, Inc.**
    b. Address: **315 West 9th Street  Los Angeles, CA 90015**
    c. Telephone number: **(213) 516-4166**
    d. **The fee** for service was: **$**
    e. I am:

        (1) ☐ not a registered California process server.
        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
        (3) ☑ registered California process server:
            (i) ☐ owner     ☐ employee     ☑ independent contractor.
            (ii) Registration No.:
            (iii) County: **Gwinnett**

8. ☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: **8/27/2025**

**Steno Agency, Inc.**
**315 West 9th Street**
**Los Angeles, CA 90015**
**(213) 516-4166**
**www.steno.com**

_____
      **Kimberly Greenway**                  ▶                           (SIGNATURE)
   (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)