# Exhibit "B"

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse side before completing this form.

ENTER CHARGE NUMBER
☐ FEPA
☒ EEOC

_____ and EEOC
**(State or local agency, if any)**

NAME (Indicate Mr., Ms., or Mrs.]
**Mr. Derek Dixon**

Home Telephone No.
**678-595-4399**

STREET ADDRESS (CITY, STATE AND ZIP CODE, COUNTY )
**507 Wilshire Blvd., Apt. 206, Los Angeles, CA 90401**

D.O.B. (if age claim)

NAME IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER |
|---|---|---|
| **Tyler Perry Studios, LLC** | **300+** | **(404) 222-6448** |

STREET ADDRESS          CITY, STATE AND ZIP CODE
**541 Tenth Street, #172, Atlanta, GA 30318**

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es)*
__ RACE  __ COLOR  _X_ SEX  __ RELIGION  __ NATIONAL ORIGIN
__ RETALIATION  __ AGE  __ DISABILITY  __ GENETIC INFORMATION
_X_ OTHER (Specify) Sexual harassment

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE *(Month, day, year)*
**Continuous**

I am a 36-year-old actor who began working for TPS Production Services, LLC (formerly And Action, LLC) and Tyler Perry Studios, LLC at Tyler Perry Studios in November 2019.

For five seasons, I have been a cast member on one of Mr. Perry's television series. Almost immediately after I was cast in one of his television shows, Mr. Perry began grooming me and made his desire to have a sexual relationship with me apparent. After shooting the first episode for the series, Mr. Perry had me over to his house for drinks. He also offered to allow me to sleep in his guest house because I had been drinking. While in the bed in the guest house, undressed with only my underwear on, Mr. Perry came in, slid into the bed with me and touched my leg. I got out of the bed and moved away. Mr. Perry asked me to turn around so he could look at me.

Throughout 2020, Mr. Perry repeatedly invited me to have FaceTime conversations with him, ostensibly under the guise of working. However, these conversations quickly became explicit interrogations about my sexual preferences, such as whether he liked to be on "top" or "bottom." He also alluded to having sexual dreams about me. I was deeply uncomfortable with these conversations, but felt that I could not reject Mr. Perry's advances if he wanted to keep my part on the show.

In August 2020, while filming "The Oval," Mr. Perry instructed me to come to his trailer on the set. There, he offered me a drink, asked if I was attracted to him, and as I was saying goodbye and trying to leave, pushed me up against a wall, commented that he thought I had a shapely "ass," and groped my buttocks. In October 2020, while on a trip to Mr. Perry's island in the Bahamas, Mr. Perry again groped my buttocks. I did my best to rebuff Mr. Perry both times, without angering him so much that my career would have been in jeopardy. Notably, this was my first season on "The Oval," and the season ended with my character getting shot and possibly dying. Mr. Perry used this uncertainty about my character's future to his advantage to coerce me into accepting Mr. Perry's sexual advances. It is important to note that Mr. Perry frequently bragged that he could "kill off" any actor who angered him.

Mr. Perry's conduct escalated in mid-2021. During a phone call that took place on or about May 27, 2021, Mr. Perry told me that he would "fuck" me. Shortly before the call, when my castmate sent a photo of himself with me to Mr. Perry, Mr. Perry said he was "jealous" of the castmate.


Initial

Days later, on June 4, 2021, Mr. Perry invited me to his house for a drink. After a few drinks, he then invited me to spend the night in his guesthouse. As we passed a scale that measured body health on the way to the guesthouse bedroom, he instructed me that I had to get into my underwear for the scale to work. I reluctantly complied. When Mr. Perry showed me to the guesthouse bedroom, he instructed me to hug him, he then pulled my underwear down and groped my buttocks. I told Mr. Perry that I did not want him to pull down my underwear and tried to move Mr. Perry's hands away from my bare buttocks. Mr. Perry would not stop, despite me asking him to stop. When I tried to pull my underwear back up, Mr. Perry said something to the effect of "Relax, let it happen" and held onto my wrists to stop me. Mr. Perry, a much larger man, groped my buttocks again. Again, I said I did not want to have sex with Mr. Perry. I then tried to change the subject as an escape and asked if there was food available for me to eat. Mr. Perry offered to get us a pizza, and in order to stop the assault and battery from continuing any further, I went with Mr. Perry to the kitchen in the main house to eat pizza. After returning to the guesthouse, I was unable to figure out how to lock the guesthouse bedroom door. Instead, I locked myself in the bathroom, where I was so upset that I began to cry as I texted a friend to tell them what Mr. Perry had done.

The next morning, I was forced to go back to the main house to retrieve my keys. When he saw me, Mr. Perry acknowledged that he had assaulted me by stating, "This is why we can't have drinks together." I responded, "Oh, so that was my fault?" Mr. Perry then acknowledged that he was the one at fault. After I left Mr. Perry's home, Mr. Perry tried calling me several times, but I declined his calls. On June 6, 2021, Mr. Perry texted me saying, "I really need to talk to you my friend. Please call me as soon as you can." The next time Mr. Perry called me that day, I answered. Mr. Perry apologized for assaulting me, said he "did not know why [he] did that," and claimed he was "maybe self-sabotaging." I told Mr. Perry that it was not OK, that I was not OK with Mr. Perry's conduct, and that I had never asked for that kind of relationship. Mr. Perry then invited me on a yacht trip. I declined.

Shortly thereafter, Mr. Perry reached out to me and said he wanted to move forward with shooting a television show that I had written. He also gave me a pay raise for my work on "The Oval." In short, Mr. Perry used his power in the industry to force me to make a choice: report his sexual assault and pursue legal action against Mr. Perry, or realize my dream of acting and having my script made into a television show.

Mr. Perry and I worked together while shooting my show, "Losing It," in March 2022. Mr. Perry returned to his old behaviors almost immediately after shooting wrapped. Most egregiously, he called me and lectured me about how I should have "had a stronger 'no'" when Mr. Perry sexually assaulted me the previous year.

In January 2023, I informed Mr. Perry that I was moving to Los Angeles and Mr. Perry responded by asking, "How is your 'no?' Is it stronger?," and saying that I "have to be able to say no. And mean it and make it clear," suggesting that he placed the blame for his sexual assault on me.

Mr. Perry called me in November 2023, ostensibly to talk about selling "Losing It." However, he then steered the conversation back to sex, asking who I was having sex with in Los Angeles, if I "was the top or bottom in the scenario," and telling me what he wanted in a sexual partner—specifically, that he wanted a man that he could "hook up" with, but who had no expectations of being in a relationship with him. It was once again clear that Mr. Perry was trying to coerce me into having a sexual relationship with him.

Shortly after this call, Mr. Perry asked me to do punch-ups on a script, and then asked me to take a role in one of his movies, which filmed in February 2024. All the while, Mr. Perry has continued to call me multiple times a month. Each call immediately pivots away from work-related matters and back onto the topic of sex, and specifically Mr. Perry's fascination with my sexual preferences. For example, Mr. Perry will tell me that he thinks I am a "sexy" man who "should be out living and having sex." This conduct continues to this day.

Throughout this whole time period, Mr. Perry has also sent me sexually-charged text messages. He frequently refers to me as "thick Derek," a reference to the fact that Mr. Perry likes how my buttocks looks when I carry more weight. He has also made comments suggesting that he will avoid seeing me because he "can't deal with thick



Derrick [sic]" or say that I should put on weight so I will "make men swoon." Mr. Perry has also complained about me losing weight because I am "without a butt."

Mr. Perry has also taken photographs of me from behind while we are on the set of "The Oval" and sent those photos to me, purportedly to "address how [my] ass had gotten smaller."

Mr. Perry also regularly makes sexually-charged remarks to me through text messages. Examples include complaining, "I haven't been touched in months," or "I don't like being horny. I feel sorry for the first person that flirts with me[.]" He also said to me that he does not care when guests at his vacation homes say thank you or give him "cards and shit" because "nobody offering what I really want," meaning sex. He has also discussed his pornography preferences and said that every year for his birthday, he tells people he wants "biscuits and BJ," a slang term for oral sex, "But all I get are biscuits."

Mr. Perry's text messages sometimes demand that I give him attention, and he gets angry if I am busy and unable to respond. Mr. Perry will make comments such as, "Don't you dare ignore me. I deserve better." I feel that I have no choice but to stop what I am doing and respond to Mr. Perry, for fear that if Mr. Perry feels he is being ignored, he will retaliate against me by taking away career opportunities. Indeed, Mr. Perry has made it clear to me that he has no problem killing characters off of his shows if they make him angry, having sent me text messages such as, "I will kill them mofos characters and walk off like this."

Additionally, Mr. Perry has tried to coerce me into isolating myself from my friends in order to extend his influence over me. He has explicitly told me that he thinks my friends "all suck" or instructed me not to see my friends.

Mixed into these sexually explicit and harassing texts, Mr. Perry also frequently asks me about my career aspirations or gives me career advice. By doing this he has made my professional advancement dependent on me entertaining his sexual overtures.

Most disturbingly, Mr. Perry engages in all of this conduct on the set of a show that occasionally requires me to appear semi-nude and act out scenes that clearly take place just before or after gay sex, while Mr. Perry directs. I am contractually obliged to film these scenes, and cannot refuse to perform, even though I am extremely uncomfortable doing so. What is worse, Mr. Perry has total control over whether these scenes occur at all, since he is the writer of "The Oval." Indeed, it is clear that Mr. Perry derives personal pleasure from watching these scenes, since after filming, Mr. Perry has commented about my body and has said that he likes my buttocks to be "thick."

After repeatedly being turned down by me, in season five of "The Oval," Mr. Perry suddenly wrote my character—previously an employee at a pharmacy—to be a prostitute. Mr. Perry wrote scenes where my character had to interact with his pimp, wrote dialogue where other characters called me a "bitch" and made frequent reference to my character being paid to have sex. In short, it seems that Mr. Perry has used his total creative control over my character as an outlet for his personal desire for me.

As another method of coercion, Mr. Perry has told me about his plans to "kill off" certain characters in his shows if the actors make him angry, and I have personally experienced Mr. Perry's anger on set if I have upset Mr. Perry by rejecting his advances.

Indeed, after I rebuffed Mr. Perry's advances in 2020, he appeared to write me out of "The Oval" by having my character violently killed off by being shot in the chest four times, only to reconsider and bring my character back for the following season. In March 2021, while filming the scene in which my character was recovering from being shot, Mr. Perry was visibly angry with me and even threatened to punch me in the stomach to make me act more like I had been shot. This treatment was consistent with Mr. Perry's repeated statements to me that he would have


Initial

no trouble killing off a character if the actor made him angry. Based on this treatment, I believed that I would lose my job and potentially be blocked from other opportunities in the entertainment industry if I did not capitulate to Mr. Perry's sexual overtures. Mr. Perry clearly knew this and used his power to his advantage. He used this uncertainty to coerce me to accept invitations on trips or to his home—including the meeting where Mr. Perry sexually assaulted me in June 2021—and to subject me to unwanted verbal sexual harassment that continues to this day. Moreover, this is Mr. Perry's *modus operandi* with other actors on his shows in whom he has a sexual interest. I know that another actor whose character Mr. Perry killed off the show at the end of season one of "The Oval" was brought back to life after going on private trips with Mr. Perry between season one and season two, which is the same behavior he exhibited with me.

Due to the intolerable conditions pled above, when filming of season seven of "The Oval" commenced in late-2024, I was unable to participate and consequently constructively discharged.

I have been discriminated against based on my sex and subjected to sexual harassment and a continuous sexually hostile working environment in violation of Title VII of the Civil Rights Act of 1964 as amended. I request that the EEOC investigate Mr. Perry's conduct as a class action on behalf of myself and the other men he has sexually harassed in a similar manner to me.

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br>Date            Charging Party (Signature)<br><br>1/13/2025      *[Signed]* B762495529E04E8... | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|  |  |

PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974, Public Law 93-579: Authority for requesting the personal data and the uses are given below.)

1. FORM NUMBER/TITLE/DATE. EEOC Form 5, CHARGE OF DISCRIMINATION, March 1984.

2. AUTHORITY. 42 U.S.C.§ 2000e-5(b), 29 U.S.C. §211, 29 U.S.C.§ 626.

3. PRINCIPAL PURPOSE (S). The purpose of the charge, whether recorded initially on this form or in some other way reduced to writing and later recorded on this form, is to invoke the jurisdiction of the Commission.

4. ROUTINE USES. This form is used to determine the existence of facts which fall within the Commission's jurisdiction to investigate, determine, conciliate and litigate charges of unlawful employment practice. Information provided on this form will be used by Commission employees to guide the Commission's investigatory activities. This form may be disclosed to other State, local and federal agencies as may be appropriate or necessary to carrying out the Commission's functions. A copy of this charge will ordinarily be served upon the person against whom the charge is made.

5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Charges must be in writing and should identify the parties and action or policy complained of. Failure to have a charge which identifies the parties in writing may result in the Commission not accepting the charge. Charges under Title VII must be sworn to or affirmed. Charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to provide the requested information.

6. [ ] Under Section 706 of Title VII of the Civil Rights Act of 1964, as amended, this charge will be deferred to and will be processed by the State or local agency indicated. Upon completion of the agency's processing, you will be notified of its final resolution in your case. If you wish EEOC to give Substantial Weight Review to the agency's findings, you must send us a request to do so, in writing, within fifteen (15) days of your receipt of the agency's finding. Otherwise, we will adopt the agency's finding as EEOC's and close your case.

NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of the Civil Rights Act of 1964, as amended, and Section 4(d) of the Age Discrimination in Employment Act of 1967, as amended, state:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed a practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or bearing under this title.

The Equal Pay Act of 1963 contains similar provisions. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.